and the estate of Fred McDowell Jr. Mr. Brennan. Good morning, Your Honor. May it please the Court, my name is John Brennan. I'm an attorney from Redback, New Jersey, and I am the attorney for the Plaintiff's Association. Plaintiff Appellant, Shark River Cleanup Coalition. I've asked for five minutes rebuttal time. Corrected. Thank you. Your Honors, I'd like to begin by pointing out a couple of things from the record, which were not directly set forth in the briefs, but were alluded to in the briefs. And if I could, I want to direct your attention to a couple of things. One is, Mack Namara, who's the president of Shark River Cleanup Coalition, when he went out on the initial walk, he didn't just find the site, which was the obvious, the untended sanitary sewer fourth main, but he found other sites as well. So that when the notice of intention was sent in October 4th of 2016, it addressed plural sites. Yeah, that was something I noted. It was strange, because the notice, which has a lot of information in it, but it seems to have only a little bit about the flying pipe. And I've got the photo finally surfaced of the flying pipe. But I didn't see anything else in the record to indicate leakage or other flying pipes. But your notice does say plural flying pipes, and also your notice talks about other violations unspecified. So I'm very puzzled, because in light of that uncertainty, but everybody filed cross motions for summary judgment. So it's my understanding there aren't, I was going to ask you to confirm, there aren't any issues of material fact in dispute. That's why everybody sought summary judgment. But you've opened now with potentially new facts that I was unaware of. No, no, no. And I'm not trying to raise any new. These aren't new facts. No, no, no. Go to the issue of the notice. All right. So there are no issues of material fact in dispute. Well, I don't know that there's, I think that there are. There are. Okay, then tell us why you filed a motion for summary judgment. Can we go back even a step earlier? I guess at this stage, and having looked at this case and analyzed it a number of different ways, I'm having trouble trying to figure out what this case, what the case is all about. Because it appears, it appears to me that through the good work that the court did, the district court did, that the township and the DEP and the estate came into compliance and completed any necessary repairs that you brought to their attention. Why wasn't that sufficient? Why do we have to go to summary judgment if everything was corrected? Everything was not corrected. What was left? 334 cubic yards of pollutants were discharged into the tributary stream. Sand. No, sand and the ID 27. So what does a township do when the sand's already in the river? Your Honor, we have had numerous events in our watershed where there have been releases. You have a continuing request to request for a continuing injunction, don't you? We have a request. Well, we have a request that they go on any cleanup, any remediation. Just answer my question. Yes, Your Honor. That's still out there. Okay. Where we are, aren't we here to talk about the notice? Isn't that what we're here for? Yes. Isn't that the only thing this is about? Not remediation. This being today, we're here to talk about the notice. The notice. An opinion this court will write will have to go to the notice. Correct. Because that's what the district court discussed, right? Correct. He didn't talk about the merits. Correct. So you may lose on the merits, but that has nothing to do with what this panel is going to be called upon to do with respect to the merits. I don't think we're going to lose on the merits, and I do believe the court will reverse. Just please accept my hypothetical. Okay. You may lose, you may win, but we're here to talk about the notice. Yep. Thank you. I also thank you for clarifying what, at least in your view, the case continues to be about. And there's the additional issues of, well, there's this subterranean easement. I've been practicing Georgetown law 34 years of practice. I've never heard of a subterranean easement. What do I feel out of, you know, we've got three Georgetown people here. Class of 88. Georgetown law. Class of 88. But I've been out on my own fighting the good fight for 34 years, Your Honor, and I will tell you that a subterranean easement without a right of access is no easement whatsoever. You have to have something to be able to do. And this is a mile-long, 1.13-mile-long forced sewer main, 12 inches wide, first feeding that sewerage ultimately to the next sewerage. What's your point there? I mean, we understand that. They have no right of access. And, in fact, we understand that whole tract of land, which is known as the ____. What does that have to do with the notice, sir? Nothing. Thank you. Okay. But it does highlight that you're fighting the good fight. The sand and gravel operation there is certainly something your organization is unhappy about on the McDowell property. No. Then why is the estate of McDowell a party to the case? Because they own the land in which the conveyance, which was the berm, which was set forth in a ____. They own the fee. Is that right? Excuse me? They own the fee. They own the fee. The whole bundle of rights, though, has a certain number of those sticks, those limbs, whatever they are, as the easement. And they are held by the township. But still, why? Why is McDowell in this? McDowell created the conveyance. So you're arguing about something that happened in the late 80s or early 90s. No. The conveyance continued to convey. The conveyance continued to convey. Access? Excuse me? Access? No. The conveyance conveyed the water. Sheet water was channelized, which is what we're talking about. We're not talking about ordinary erosion, which occurs as a result of sheet water. We're talking about sheet water, which channelized into a channel. I readily admit, I'm lost. And I represented two sewer authorities back in the medieval times when I practiced law. Right. This easement exists because of a taking. Correct. Exercised by the township through the filing of a notice of taking, pursuant to its power of eminent domain. Correct. OK. So, I mean, I'm trying to understand what your description, your lengthy description you just engaged in, has anything to do with that. Or McDowell, for that matter. Isn't this all about the easement? It's held by the township. That is why the township is included, but the easement is only 25 foot. Included? Is included as a party defendant. Is there a sewer authority here? Neptune Township Sewer Authority. Why weren't they named as defendants? Because they don't maintain that pipe. They did not install that pipe. Neither is the estate of Fred McDowell. The township maintains the easement and the pipe. It's the township's pipe. The problem with McDowell is that it's only 25 foot wide, the easement. The conveyance of the water comes from off of the easement. Who is paying the water? The Skies or the estate of McDowell? The estate of McDowell. If the water comes down and it flows, that's sheet flow. Right. Not a CWA violation. Exactly. Absolutely. Right. So what has McDowell done to alter the land to cause a CWA violation? If you look at pictures, and I'll give you the citations. I have the picture right here of the flying pipe. No, no. I'm talking about the channel, what Fitzpatrick calls the berm. Okay, so the berm is the point source here? The berm creates the channel. Is the channel the point source? The channel was initially the point source. Okay, then where in your notice do you indicate that the channel is the point source? Where in your notice does that appear? Because you can see that the regulations require you to identify many things. You must identify the location, the point source, the alleged violator, and the specific part of the Clean Water Act that has been violated. So I'd like you to actually tell me where all those things are in the notice, but I want you to start with channel, because you've just identified the channel as the point source. So where in the notice do you tell them? The notice says the installation of the sanitary sewer line. Which page of your notice? It's, the notice is page 20. Well, it's numbered. The notice itself is numbered. Okay. What page of the letter, the notice? Notice is just a seven-page document, I believe. Right. Sounds great. And most of it, as I read it, talks a lot about the general conditions of the Shark River and the environmental conditions, et cetera, et cetera, et cetera, and there's almost nothing about the location, the point source, et cetera. That's my view, but you can rebut my, I'm asking you to rebut my view and start by telling us where in this letter you identify the point source as the channel. And if I might, where the regulation requires you to do that, because I think Judge Hardeman and I are reading the regulation differently. Okay. What I would say is this. The notice of intention says that installation of the sanitary sewer line disturbed the vegetated cover of the sand in which the subterranean pipe was installed. That disturbance and an obvious lack of maintenance of the easement has created a dangerous condition. Several sections of the sewer pipe have been undermined and are flying in the air without support. This condition threatens the structural integrity of the active sanitary sewer pipe within a short reach of the Shark River brook. Furthermore, in other locations, due to the installation of the pipe and failure to maintain easement and the activities being conducted by the owner of the property, large areas of sands have washed out and infiltrated into the district and discharged into Shark River brook. So while it... I see you didn't mention the word channel. Not, because I did not, I drafted this notice. The information that I had at the time that I sent out the notice was the information that we had garnered. We had McNamara who had gone out twice at that point in time, the second time he took the two photos. What camera did he use to take the photos? His cell phone. Okay, and that cell phone would have geolocated the place. So why in the world, when you sent this, saying photos available upon request, and they requested the photos, photos with a geolocation that would have pinpointed the flying pipe, why in the world would you not have given them that information? Other than perhaps to continue litigation. That's not what happened, Your Honor. What? What happened? First of all, McNamara, as far as I know, McNamara had a flip phone. He doesn't know anything about geolocations. The man sells insurance for a living. He had a flip phone? As far as I know. Well, I'll ask you to supplement the record with... I don't know that he has a flip phone. I'm saying as far as I know. I'm asking you now, and we will in writing, ask you to supplement the record with the phone that took the photograph. Because I think it is relevant, at least to me, whether that could have pinpointed the location, because we had six different people walking that easement, not finding it over a year's time. You said the photos were available upon request. Multiple parties requested the photos, and you did not provide them. Your Honor, respectfully, the photos are red herring. They found, listen to me, they found the site without the photos. Early on, they asked for your photos. What's that? Early on, the estate asked for the photos. Right. So you don't deal with non-lawyers. And I don't. And what happened was that there was a meeting, and it was discussed, and McNamara said... But you said you would supply the photos. Why wouldn't you supply the photos? The coalition would supply the photos. Mr. Redding, red herring or not, you didn't supply the photos. That's true, I did not supply the photos. Probably would have been helpful if you had. But could we focus on the regulation here? The statute doesn't provide us or provide you or provide a citizen's group with the requirements that the notice is to contain. Rather, a regulation does. Correct. Now, did you have, did you access, did you use Section 135.3A when you drafted that notice? You're talking the statute. No, I'm talking the regulation. I did not have the regulation. All right. That's interesting. But do you know what the regulation says? I do now. That's really what we're here to talk about, isn't it? Isn't that what the district would analyze? What I would say is this. Now, it's susceptible to a yes or no answer because it's in violation of what the district would say. Yes, the district would analyze it. OK. Let me just read this. Notice regarding an alleged violation of an affluent standard or limitation or of an order with respect thereto shall include sufficient information. OK. Talking about information. Facts. To permit the recipient to identify. So you have to give enough information to the other side, in this case, to the township and for whatever reason to the estate, to permit the recipient to make determinations, to identify the specific standard. Did you do that? I did. Where in the notice is the specific standard referenced? There is no specific standard in as much as it is a violation of the statute. But wait. To Judge Smith's point, the statute isn't that helpful here. We need to drill down to the regulation. So I'm suggesting to you that it's not enough to send a notice that says, you, recipient, have violated the Clean Water Act. Please clean up your mess. That doesn't work. The regulation says it shall include sufficient information to permit the recipient to identify the specific standard. Where in your notice do you provide that information where they could identify the specific standard, limitation, or order alleged to have been violated? Can you just tell us where in the notice that is? Your Honor, the standard is not in the notice because this is not a standard case. A standard case is where, for instance, there is a permit that limits the amount of a particular pollutant in an FUD. I don't know what you mean by standard case. Here they have a permit. Excuse me? Here, as I understand it, they have a permit. They have no permit. I thought they had an NGD. Has the permit ever been produced? Wasn't there controversy over whether it was permitted? There is no permit. I thought the permit was not at issue, but they do have a permit to conduct the sewage through the pipe, right? Isn't that something that was properly permitted? They don't have a permit to dump 334 cubic yards and 20 dump truckloads of pollutants. That wasn't my question. My question was about the effluent running through the pipe. They never produced the permit. They never produced the plans. That was never an issue. Right. That's my point. That's not at issue. What is at issue, as I understand it, is the pipe wasn't leaking. There's not a problem with the sewage running through the pipe. The problem is when you look at that photo, you can see erosion under the pipe. The subterranean pipe ceased to be subterranean in a certain small section of this 1.1-mile easement, correct? Three point. They said it was three miles, but it's actually 1.1. Is it correct? Six thousand square feet. Right. You have 6,000 linear feet. But your notice, your notice, of course, says 3.15 miles, correct? Okay. And the reason why that is, you want to know what the reason why that is? Not really, because we've got so many questions for you. All right. I want to make sure we're all on the same factual playing field.  It's a problem. It's a problem. When you look at the pipe, any rational person would say, well, that looks like a problem, because it has eroded. It is no longer a subterranean pipe in that position. So the erosion is causing some flow of the sand, right, into the Shark River discharge, right? And the question then becomes, is that discharge of the sand a Clean Water Act violation? It is. Or is it the cause of silviculture or rainfall? Because if it's silviculture or rainfall, it's not a violation. Otherwise, it is a violation. Correct. Same page? I'm with you, but it is not silviculture operations. Did the district court address those issues? Did not. And it did. Excuse me. I just asked you a question, sir. Yes, it did. And you answered it and then turned away. All right. It did. That's a merits issue, isn't it? Excuse me? That's a merits issue, isn't it? Yes. What does that have to do with today? Nothing. I mean, this is about the quality of the notice. Right. So let's go back to Judge Smith's quoting of the regulation and Hercules. It's sufficient information. Right. And they found the site. Well, that's your argument. I understand that from your brief. Your argument is, because they actually found the site, it therefore follows that we provided sufficient information. And that means if it took a small army of 100 people and 20 visits and they finally found the site, under your theory of the case, you provided sufficient information. But that's not what happened. Because all that matters is they actually – well, what did it – Not theoretical, Your Honor. But it wasn't a small army, but it was a large number of people spending extraordinary amounts of time trying to find it. And your own coalition member, who at the time was with the DEP, he couldn't find it. And he even testified that if he had just been given the information, he would have been able to find it. You give them the cell site location information, the geolocation information from the cell phone. If it's a flip phone, ignore what I just said. I don't know what it is. I don't know whether – and I don't know whether the man can operate a geo site. I know I can't. No, no, no. It's not about – it's about responding to a simple request for information so that the alleged violation can be quickly resolved rather than have years and years of costly litigation for it. But the situation hasn't been resolved. They haven't retrieved and mitigated the 334 cubic yards of pollutants that they put into the Shark River Brook. Well, that's – as Judge Smith said, that's a merits issue. They're – whatever erosion went into the Brook, it has not yet been determined whether that was exempted from the CWA as silviculture or runoff or an illegal discharge. It's an illegal discharge. Well, we know that's your argument, but we've got to focus on the notice. Can I just say something? Wait a minute. Go ahead. Can I bring this back to the notice question? Yes, sir. Okay. And we talked about location. All right. But – and there was the beginning of some discussion, and I don't think there was an answer, as to whether your notice specifically alleged the violation that you were claiming. It alleges a violation. And tell me how that notice – first of all, do you agree that the regulation requires you to give specific – the specifics of the alleged violation? In the notice. I followed the statute, and what the statute said was I had to identify what the nature of the violation was. And what I said was – because at the time, what I had was – what I had was I had McNamara's two walks through the woods. The first time – the second time he got lost because he was by himself, but he went on and he found it. It wasn't difficult for him to find it. You referred to the statute. We've been talking about a regulation, right? Right. Not the statute. A regulation. Does the regulation – please look at the language. Does the regulation require you to – Give specific location. It does not give the specific location, but it gave sufficient information. I just asked if the regulation requires you to give specific – No. It provides – it requires sufficient information so that they can identify the – To identify what? The location. I asked the question about does the regulation require you to give specific information to identify the violation. The sufficient information to identify – so that they can identify the violation. And again – It requires that. So you agree that the regulation requires that. Right. Sufficient information. And did you give that sufficient information? I did. I did. I told them that pollutants were discharged from the site – from their site along the easement in multiple locations. That's your argument. That was all I had. You said that they were pollutants. Right. Which becomes a violation of the statute. Right. And that they were discharged at various locations. That's your argument. That's what I said. Thank you. Thank you for your answer. Okay. And regulation requires you to provide sufficient information for the recipient to identify also the date or dates of such violation. Would you please direct us in your notice where you identified the date or dates of such violation? It was an ongoing violation. What happened – and we know this – we know this by virtue of the fact that when they went in for the emergency permit, Andrew French, who was finally the engineer who they brought on – here they are. Oh, we need to fix this. We want to fix this. But they didn't even bring their engineer on the site until after the adjourned site inspection. So they didn't really get serious about cleaning up this thing until well after the event. So this idea that somehow they were making an effort to try to comply, come into compliance with the statute, is also a red herring. But what Andrew French – Can I take you back to my question? Yes. I asked you where in the notice you identified the date or dates of the violation. At the beginning of your answer, what I heard you say was it is a continuing violation. It is a continuing violation. Okay. So tell me where in your notice you told them that they have a continuing violation. The conditions – it goes on to talk about that it's a continuing thing in the notice. Just tell me where. Tell me where it says you have a continuing violation, because I just don't remember  All right. Bear with me, Your Honor. It also has damage and threatens to – I'm sorry. Please tell me what page. Page 3 of the notice, Your Honor. Page 3. Okay. Just how many lines down? It's the second independent paragraph beginning with the installation of sanitary sewer line. Okay. And it is the third line from the bottom of that paragraph. Okay. It has also damaged and threatens to further damage the Shark River watershed. Okay. It – is that the sentence? These conditions – Oh, it has also damaged. What's the it? The violations of the Clean Water Act. The washing out of the pollutants into the discharge of the pollutants. Well, okay, the sentence before that says furthermore in other locations. Right. Have those other locations ever been found or identified? Where are they? Because, again, my understanding of the location in this case is the so-called flying pipe that we have a photograph of in the record. Correct. But here you say furthermore in other locations. Where in the record are those other locations pinpointed or identified? Mr. McNamara, when he went out with the initial – with the hiker, came back and reported that he saw a number of sites along the easement that had similar situations. Additionally, Fitzpatrick, who was our expert from Argent Engineering, when he plotted this all out on topographic map, when you see what – when you look at the topography, you see that what happened was there was this 80-acre upfield drainage area, which was identified by Andrew French. And it all comes down, and instead of going sheet flow into a tributary, there was a berm there, which channelized the water, brought the water to this site, and it exploited the situation from the man-made situation where they had backfilled the pipe without sufficiently securing the soils on top of it, and the soils were mixed with solid waste. So it sounds like the drainage area is the problem. Is that the point source? No. There's drainage areas everywhere, but when you channelize water through man-made activities, you create a conveyance, which is violative. All right. So there are other locations, but we don't know exactly where they are? No, because we were not permitted to – when we went to the site visit and we asked to go to the other sites, we were told we were not permitted. At that point, it was not pursued any further. But Fitzpatrick put in his report, when you look at the topography of this site and the mile-long easement, you will see that there are gradients on the topographic map that show that there were similar conditions to what we have found here. And it's pretty obvious that Wall Township did not maintain its easement ever, so that If that site occurred in those topographic conditions and there were other sites that were similar topographic conditions, one would say that there are additional sites. That confirms what McNamara said, that he had seen other sites of washout and pipes exposed. All right. So your answer to my question about where you identified the date or dates of such violations, you say it's a continuing violation, but you don't really have any language that says it also has damaged and threatens to further damage the Shark River watershed. Correct. Okay. So that's the date issue. On the location issue, I guess we've covered the ground. That's the photograph. But you say that they didn't need the photograph because they found it. And finally, the location of the alleged violation. And again, your answer to – because it's not enough just to say you have a problem here. You have a problem here because of this alleged violation of the Clean Water Act. For example, in this place you're dumping PCBs into the river, or in that place you're dumping sewage into the river, et cetera. So where in your notice do you tell them the location of the alleged violation? Okay. In the notice, which is what I had at the time in October of 2016 when I drafted this notice, was I had the fact – I'm not asking you what you had. I'm not – if the notice is inadequate, I'm not blaming you. What I'm asking you to do is to tell me where in the notice you identified the location of the alleged violation. When you suggest that you didn't have a bunch of things, that sounds tantamount to saying, you know, I maybe didn't cut the mustard, but I did the best I could under the circumstances. That's what it sounds like. Well, Your Honor, I gave them sufficient information is what I would say. I would also say – But wait. I'm asking you a direct question about whether you did that. And I'm asking you to tell me where in the notice you identified the location of the alleged violation. Because that – you need to talk about what the violation is. This discharge of sand is a violation of the statute per se. All right. Now, I think you've really helped me, at least, because you've told us the sand is eroding all along the easement, all along the pipe, and the discharge of sand is the violation. Is that right? Your Honor, the – So the whole pipe is – the whole easement's a problem in your view. There is a question. Potentially a problem. Yes. Potentially a problem. We know for certain. And again, you know, judge thinks from 20-20 is – with hindsight, 20-20 hindsight is – Answer Judge Hardiman's question. Okay. And please answer my question. All right. Is your position that the easement itself, which is possessed by the township, pursuant to a declaration of taking through the eminent domain process – and I'm not sure its length now as a result of this argument, whether it's 1.1 miles or 3.1 miles or whatever, but the entire easement and its identification was sufficient for your purposes, sufficient information to the township as to location. Is that your position? Yes. My position is – and what it was, was that if – again, if – what Ambrosio said was, if they walked the easement, they would have found the site. Additionally, when I asked, there are 12 – The easement was the site. They didn't need to walk anything. It's the whole easement. It's the whole pipe. No, I'm not saying that – I'm not saying that the easement is the entire – is the You said there are several sections of the sewer pipe that are flying in the air with erosion. No, there was one section where it was flying in the air. It says – I'm quoting your language – several sections of the sewer pipe have been undermined and are flying in the air without support. Correct. And there are other sections – That are flying. They are – they are – Yeah, as yet they are underground. They are under – they are unearthed. They are unearthed, so there's no sand on top, and there is space below them and ultimate ground. So is it flying? Yes, it's flying. This was the site that was most – when McNamara went back – remember, when McNamara went back to take the pictures, he went to this site. This was the site which was of greatest concern. Okay? That's – so this was the site. I drafted this based upon the best information that I had at the time, and it's sufficient information as far as I'm concerned because when I took their 12B3 deposition, Mr. Lentini – I sent out a 12B – not 12B3, a 30 – a corporate representative, 30B6, deposition notice, and they produced this guy, Greg Lentini. He was the director of public works. And I said, when did you find the pipe? And he wasn't sure. He went back and forth. He wasn't really sure, but he said, I believe it was in November of 2016, which would have been proximate to our October notice of intention. So – and I said, well, how did you find the pipe? He said, well, I sent out these guys, and they walked the easement. Additionally, prior to that – and this is in the – Zahorsky, who is the in-house engineer for Walt Township, and I took his deposition as well. But Zahorsky, on 10-31 – so the notice of intention is 10-4. On 10-31, Zahorsky sent this email, and this is at 8-54 in the appendix, to Lentini. He said, we have received a complaint from SRCC regarding several wash-ups and exposed sections of pipe. Could you go check it out? So that was on 10-31, 2016. Then, when I take the 20B6 deposition of Lentini, Lentini says, yeah, I think we found it in November of 2016. I said, how did you find it? I sent these guys out. They walked the easement. That's the record with respect to that. That creates an inference that they found the pipe before there was ever a complaint. Irrespective of the historical fact or lack thereof about whether it was found and when it was found, do I understand your position to be that it is sufficient information to identify the easement, which is narrow, and that the identify – sufficient information to identify the location is satisfied from your point of view simply by that identification of the easement because they could send somebody out and walk it, have an ATV run the distance of it, go out with your engineer? Is that your position? I mean, I'm just trying to figure out what your position is pursuant to the only thing that matters for purposes of this appeal from the district court's order and opinion. Is that enough? Is that sufficient information? I think everything is in context, Judge Smith. And that is not an answer. Okay. The answer is yes. Okay. And the reason why is because we didn't have any more specific information. I understand. And you identified the statute. Albeit, exec, you didn't go further and identify a specific section of it, but you identified the statute as a whole. Is it your position that that was sufficient information to satisfy the standard? I do. And I would say this with respect to the statute. We could have saved about 20 minutes here if we could have gotten to those questions and concessions. And, Mr. Bryan, you have reserved five minutes for rebuttal. I have, Brian. Are you willing to give up any of that time? I don't know what my adversaries are going to say, and I'm not going to put it. I understood. As those of you that have appeared before this court know well, the red light doesn't always mean stop. I was wishing it did. Mr. Bryan, you're not allowed to stop. You wanted us to stop. No, no, no. I want us to get to the bottom of what's going on. I mean, look. We all are in that endeavor. I'm going to let you sit down, and you're not required to use your rebuttal, but you're welcome to use it if you want. I'll wait to see. Let's hear from Ms. Simone. If it pleases the court, my name is Erin Simone. I'm with Mally Gibbons, and I'm here representing Defendant Walt Hatcher. Ms. Simone, may we begin with you where we just ended with your adversary. Okay. And, in particular, homing in on the one thing that matters, the language of the defense. The language of the regulation, section 135.3A. Mr. Brennan has suggested, in response to my question, it should be sufficient, given the language of the regulation, for him simply to have identified the easement. Why isn't that correct? Let me finish. The township owns the easement. The township created the meets and bounds of the easement in its declaration of taking. The easement is, please tell me, how long? So there is dispute as regards to the length of it. Our expert witness says it is 6,000 feet long, so a little over a mile. A little over a mile. Yes. Why is that so onerous, and why is that not sufficient, given your ownership pursuant to the taking? As to meet the regulation, you own it. You have an obligation to maintain it. In fact, your easement is not only an easement that permitted the construction of the pipe, but you have a maintenance easement, too, don't you? I don't believe there is any. You did during the course of construction, in any event. You don't need one beyond the easement that you have. Why is that so onerous, but more particularly, pursuant to the plain language of this regulation, why is that not sufficient information to permit you, the township, the recipient, to identify the location? Okay. Several things to unpack on there. First, I just wanted to point out that in the notice and in the litigation, plaintiffs were not talking about the entire easement as a violation. I specifically asked that in- That's not what I was asking. Well, it's relevant to- Sufficient information to identify the location. A walk, an ATV ride, a tour with your township engineer, reading at the meets and bounds. Why is that not sufficient to permit you to identify the location? Because the picture that I have would not, if you've tracked the easement, you wouldn't miss it. Okay. So the answer to that is the site itself. The site is in a heavily wooded area. It is not marked at all.  Heavily wooded, though it may be, if you have a problem with that sewer line that you own, that is in an easement that you own, you're going to have to get there to repair it, right? In fact, if you're doing some kind of regular maintenance, you're going to have to get there, heavily wooded, though it may be. That is true, but in that case, they would know where the problem is. They wouldn't have to find the problem. If there were a problem, they would know where the problem is. If someone would have told them where the problem is, and they would have went to that problem and fixed it. Okay. The pipe is subterranean, right? Yes. Okay. So is it your understanding the CWA and the regs require that if a group says that there's a problem with your myelon pipe, it's your obligation to go examine the entirety of the myelon pipe, including figuring out whether it's leaking, a subterranean pipe is leaking, by excavating the entire pipe? We do not, I would not imagine the CWA would require you to excavate the entire pipe. Well, if it's subterranean, what are you going to do? How are you going to inspect it? Well, if it were leaking and they told us... Well, but there's no allegation that this was even leaking. Well, that, yes, there was no allegation. This is about the sand eroding around the pipe. Exactly. Right? And so they would, at that point... So to Judge Smith's question, if it's really just about the sand eroding under the pipe, is it reasonable or appropriate or required, more importantly by law, that you walk the mile to try to find out where the erosion is? I would say that it is appropriate to try to do that, and in this case, we did. There was, and as soon as they got the letter and the record, it says, our engineer, the township engineer, sent an e-mail to the public works department and said specifically, and I'll even quote it, can you take a look and see if this is in fact true, and if so, can we fix it? So they were worried about finding it and fixing it. They sent people out. They were not able to find it the first time. The public works director e-mailed the township engineer again and says, I'm going to send them out again. And they went back a second time, still couldn't find it. And I'll point out, both the DEP representative and our expert discussed in their depositions and in the expert report their attempts to walk this, and they said it's very easy to become disoriented and you don't really know whether you're in or out of this easement, and so while they tried to find it, it really wasn't clear whether you were in or out of the easement when you were walking, and so when they looked, they just didn't find the specific location. And so that's when the engineer wrote to Mr. Brennan and said in an e-mail, can you please provide us with these photos and can you please provide us with the location? We were expecting a response to that, and in fact, the depositions of our minister said, if you would have told us, we would have went out and fixed it, but we just couldn't find it. But you eventually found it. We did, after six times of going out and searching for it. And a short period of time after the complaint was actually filed. So I do want to address that. That is actually incorrect. So when they found it, so to what do we look at to determine, in determining whether or not the notice is sufficient? Well, just answer that before we answer Judge Fisher's question. I'm sorry, which one do we answer first? The one you said it wasn't quite right. I was interested to hear why it wasn't quite right. Because I thought, consistent with Judge Smith's question, that it was about a month, within a month, after the complaint was filed that you found it. All right. So Mr. Brennan is correct. He had the Director of Public Works come and testify. And during that deposition, he was asked when it was, and he said 2016, he thought. But then he said, am I right? I'm not really sure. And plaintiff's attorney said, well, it seems like you're thinking. And he said, well, I said, when we found it, we were going to repair it, and we were stopped. So the exact date I cannot tell you without asking. And the people who actually found it were Mr. Petroff and Mr. Lang. So he didn't have the specific date. And when Mr. Petroff, yes, when Mr. Petroff prepared his certification, he very clearly stated it was in November of 2017, after the lawsuit was filed, when they actually found it. Well, so it was a short time after the lawsuit was filed. Yes. I'm sorry, yes. It was after the lawsuit was filed. It was not after the notice, which was in 2016. So why was the predicate of my question wrong? Maybe I misunderstood. I think she thought you said notice when you said lawsuit. Oh, yeah. I misunderstood. I'm sorry. So we're all in agreement. It was shortly after the lawsuit was filed. Yes. Which raises, you know, some inference perhaps that, well, you really got motivated to look for it after the lawsuit was filed. What's your rejoinder to that? So I don't know that motivation was the – so part of it is that really, one, they couldn't find it, and two, they didn't know whether this was an actual, you know, situation. Well, yeah, that was interesting to read. There was testimony that I didn't see rebutted in any way that said when the photographs were not forthcoming, even though the notice said available on request, some of your people said, well, I guess there's not a problem because we're not hearing anything back. Yeah, right. So that suggests that your people stood down for a period of time after that. In fact, the testimony I think I'm paraphrasing was, well, I guess there isn't any problem there because we're not getting a response. Right, because if there was a problem, we would have thought that they would have provided us with – Fischer has had a few questions. Let's go back to my question. Can you repeat your question? Okay. In ascertaining whether or not the notice is sufficient, what should we look at? So the Third Circuit actually has provided you with that information in the case of public interest research group versus Hercules. Right. And in that case, they said that you should consider the purpose of the notice. And they said at page 1249 that you should consider the purpose, which is to provide the recipient with effective as well as timely information. And the reason why they thought this was the purpose of the notice is to meet the twin goals of the Clean Water Act, which is to have timely enforcement, but also to allow citizen suits as a last resort for compliance. Right. To try to forego lawsuits, in fact. They didn't want you guys to have to have these. In fact, this whole lawsuit could have been avoided if we would have had more information, right? And so I think in this case – I think that's kind of the question that's entirely at issue here in this case. But that's still not answering my question. So you have to look and see was the information – did the information provide you with the recipient with sufficient information to locate the – So let's stop there. So would you agree that one of the things that we can and should look at are the four corners of the notice? Yes. All right. What about should we evaluate the outside information? In other words, the information that you, the township, had and that the estate had? Yes, you can look at it. Okay. Should we also evaluate what information wasn't in the notice? Yes. All right. And should we look at the remedial actions that the township took to rectify the alleged violation that was included in the notice? Yes, but with regard to that, that it gets a little difficult because that wasn't able to be taken until after the lawsuit was filed. I understand that. But we're here today after the lawsuit was filed. We're here to determine whether the court properly said the notice was insufficient and granted summary judgment to your client. That is correct. But I would point out that once the lawsuit is filed, rectifying the situation gets more complicated because they can't do it as timely as they would have liked because there were spoliation issues. If they would have done it without plaintiffs being able to come and see it beforehand, there may have been issues. There was fights in the beginning of, like, exactly where this location was. As you pointed out, the notice had multiple locations, and they did not know where these multiple locations were. Also, there was issues of whether there was an actual violation because- What was your understanding of the alleged violation required by the regulation? The regulation requires the location of the alleged violation, not just the place, but a thing happening. What was your understanding of the alleged violation? To be honest with you- And with reference to the notice. To be honest with you, I actually struggled a lot trying to understand what the violation was because when I took a look at it initially, it looked like, based on what they were describing in the notice, that this was an erosion situation, in which case there are exemptions for erosion. Stormwater, if there's some closed-entirely stormwater, it's an exempt. The town had a stormwater permit, and we did produce that in discovery. There was silviculture going on in there, and drainage from silviculture, including silviculture roads, is an exemption. And so we weren't really sure when we got the notice. How specific should the citizens group be with respect to the violation as it's been characterized, or to use the language of the regulation, the specific standard limitation or order? How much legal research should have to be done? I think we can all agree, on the face of the notice, that the CWA HEDFAC is what was cited. Interestingly, and correct me if I'm wrong, the complaint itself is no more specific than that. And of course, it stood. This went to summary judgment. So to put it another way, the citizens group here was just as specific in the notice as they were ultimately in the complaint that they filed. Right? That's true. So the purpose of my question being, if, as you suggest, and I think for what it's worth, I think you're right, given what we've said in Hercules, the purpose of the notice is, why wasn't that enough to simply allege that there's been a Clean Water Act violation, describe it, direct you to where it is, and you determine, provide you with sufficient information so you can determine whether there's a violation here or not, if the purpose is to try to avoid litigation. So it doesn't avoid litigation if we don't know that there's an actual violation. Right? If we looked at it and we say, hey, this is a stormwater discharge, it seems that it might fall under our notice, or Clean Water Permit. We had a lot of time here. This is, you know, it's only a 60-day provision here, and yet it was over a year before the complaint was actually filed. You can hardly suggest here that the coalition and council rushed out to file a complaint just so they could run up council fees, right? I'm not suggesting that they rushed to litigation. However, I am suggesting that if they truly wanted this fixed, if they truly wanted this to come into compliance, they would have given us more information so that we could have done that and avoided this lawsuit. And as I said, they wanted to. The email said, let's go out, see if we can find it, and let's try to fix it. And as soon as they were given the exact notice, or excuse me, the exact location, and as soon as they were given a lot of plaintiffs to do the site inspection, they fixed it within three months, which is lightning speed for municipal world. Well, for the life of me, I can't figure out why the photographs weren't turned over. But they weren't. That's a fact. And so that's information that you didn't have. Right. We can look back. We don't have, as of that point in time, which, again, requires us to look to the four corners of this notice and what's required, or the four corners of the regulation and the notice and what's required. Right? And I apologize if this doesn't answer your specific question, but I think the fact that everybody who received this notice, DEP included, couldn't find this location, this violation, is very telling of whether there was sufficient information in it or not. I mean, it'd be one thing if a defendant got it. To the contrary, you eventually found it. We did. It was locatable. Yes. But the purpose of the notice, as you point out, is you get 60 days to take action. If you can't find it within that 60 days, then your notice didn't do what it was supposed to do because another person may have come in and, within 60 days, went ahead and filed it. Into the easement. 25 feet. And when you said it was hard to get disoriented, I'm not sure I understand that. Correct me if I'm wrong. What I take that to mean is that because it's subterranean, you think you're walking the easement and you're going about and you think the pipe is right next to you, but after a piece, all of a sudden the pipe is over there a ways. And you don't even realize it, that you're not on the easement anymore. Is that what you're referring to? Yes. Because I don't really understand how deep is it? One of the things here, I thought, there are manholes. You can go from manhole to manhole. So the expert, our expert, did indicate that. He did discuss that in his report, and I don't remember the specific page. I apologize. But he did indicate that there were not manholes the way that you would expect manholes. There were air valve covers, and they were not at any kind of interval that would be consistent for you to follow. And so one of the things, and I'll just read a little bit from the report so that you can understand what we're talking about. When he was discussing, the expert was discussing his trip in there. He says, the force, excuse me, the property along the easement and the force main route is densely wooded except for a few locations. The easement is not marked, and there are many paths crossing through the wooded area that can be mistaken for the easement. It's very easy within the wooded area to become disoriented, and difficult determines one's location. And he also had indicated that when he, and I don't have this site specifically, but I can grab it if you'd like. He did indicate that he was plotting where they were walking when he was doing this trip. He said the first time he ended up knee deep in wetlands, and then the second time he ended up at the haul road and realized he wasn't anywhere near the easement. And he said when he went back to look at it, he was outside of the easement quite a bit during this walk. So it is not something that you can just follow when you're walking without having... If that's the case, why would the pictures necessarily have helped you? I don't know that the pictures would have necessarily helped all the way, which is why they asked for the location in addition to... Did it matter, it seems to be suggested in the record, from what point you began the walk, from the pumping station or from the other direction? So Mr. Ambrosio seems to believe that going from the other side, from the parkway side... He doesn't seem to believe it, he believes it. Right, and he had that information. He also had information that it was on Blueberry Acres. Do you know if there's a record show? Do you know if your people tried that at all? I don't believe the record is specific in which way they went. We don't even know how many people went out how many times. I know... Yes, the record does say they went out six times. The record does say at least two people, I don't know if more, but there was at least two people who went out six times. There may be some challenge or disagreement from the other side on that. Those people included various stakeholders, right? There were people from the township, there was someone from the state who went out, and there was the fellow from the DEP who, as I understand it, is now a member of the coalition. Yes. And he couldn't find it either. That is correct. So the state, DEP was the state for this purpose, and the gentleman, Mr. Ambrosio, from the DEP is also now currently a member of plaintiffs. He went out, according to his testimony, four times before he was able to find it, and he was not able to find it until he got additional information from plaintiffs, plaintiffs' presence specifically, that it was on the parkway side, and he gave them the photos, and he may have given... You indicated that the photos might not have assisted in finding this, right? They wouldn't have assisted in finding the exact... Well, I think it depends on if there were... If it was so dense, it must have been difficult. Did you ever ask if it was a cell phone or a flip phone? We did not. I don't believe that that was discussed. Because if it was a cell phone, it should be geolocated unless someone shut that off. Yes. I don't know that that was specifically asked in discovery. I do know that we weren't given the pictures, so... What does the record show about the frequency with which members of the coalition or their agents went out to this actual location prior to the litigation? So prior to the litigation, the members of the coalition went out the first time with a hiker who specifically... Well, it was the hiker who located it and took at least the president of the coalition out, right? Yes. So the hiker found it and took plaintiff's president out the first time, and then plaintiff's president waited... And couldn't find it, right? And came out the second time, and he actually got lost. Knowing where the location was, he got lost. Right. So it's so dense, the folks with the coalition couldn't find it, but somehow they should be obligated to locate it before the owner of the easement, who presumably has more knowledge of this terrain than the members of the coalition, had to find it. Here's the thing, right? Something very simple that they could have done was taken us out to the location, just like the hiker had done for them. Well, I thought the record, as you just indicated, shows that the president himself, the president of the coalition, became lost when he attempted to find it again. He went out three times altogether by himself before the lawsuit was filed, and he got lost both times. But he did end up finding it because he knew the approximate location. And then when he found it, they called you and they brought you out and showed you. No, they did not ever bring us out. When did they find it? The township? No, president and the hiker. I believe it was in 2015 when the hiker originally took them out. And so they – so the hiker sees it, he identifies the problem, tells the coalition, then they go out together with the president of the coalition, and they actually find it after a little bit of difficulty in 2015? I believe the first time they went out with the hiker, there was not difficulty. The hiker – there was no evidence of difficulty the first time when the hiker took them out. No, I'm saying after – when they tried to re-find it. Yes. They had some difficulty. Yes, that was in 16. Okay, and then when did they find it? They found it in 15 with the hiker. No, the second time. When did they – Oh, that was July 2016, I believe. Okay. And then in a round world, they say, hey, you know, we're in a little trouble, but we found it, guys. Come on, let's go. We're going to show you where this problem is. That never happened. That never happened. And presumably, even though you know the easement, you know it's a mile long, they actually knew where they were twice, the hiker at least. Well, the hiker knew once, but I do believe they went out without the hiker the second two times. So one would expect they would know exactly where to access the easement, et cetera, to find it. And they never told you that. Right. And certain information that they had was that it was near a road. Did they give you any information at all? You asked for the photos. Did you ask for any other information? We asked for the location. That was what was put in the email. We asked for the photos. And what was the response? There was no response at all. And plaintiff's president did admit during depositions that they had received that email. Plaintiff's they admitted what? Plaintiff's president admitted in the depositions that they received that email. So in other words, even irrespective of Mr. Brennan's policy about not contacting parties, the president could have contacted you directly. The president could have contacted me. That's in the record that he's admitted that. He had that information. Yes. He was the one who knew exactly where this location was. Okay. All right. Any other? All right. Let's hear from Mr. Novak on behalf of the estate. We're going to encourage you not to retrod the ground that has been trodden. Trotted? Trotted. You must have been speaking to my family and my staff. They know my ability. My analyst says I'm coming out of my shell and he's making progress. Good morning, Your Honor. Focus on the estate. I guess the main question is are you going to make a separate argument as to why, even if Wall loses here, you win? Yes. I don't want to rehash old ground. Your time is valuable. And plus, my colleague is very well skilled in this file. John Novak appearing for the estate of Fred McDowell. You know, a little context. We've been looking very, very narrowly, laser focused on the four corners of the notice. And I think that's appropriate. That's the genre of the appeal. And to wander too far, I feel that may not be efficient. I take more of a drone satellite view of this. And I think that context is appropriate, not just for me to vet my spleen about something I've been bemoaning since the very, very first day, that this was just a money grab by the Shark River Cleanup Coalition. I've been bemoaning that for a long time. I'd like to focus on their notice in the context of what they did or what they didn't do. So, you know, the idea in the act is that when you get this notice, whether you're a property owner who unfortunately has liability under the act or in this case, Wall Township, who I've said against Wall Township since the beginning, it's not our pipe, it's not our stuff, and it's not our problem. It's your problem. And I still believe that. But the reason why there's money sanctions and the exposure to attorney's fees is to serve as a deterrent for someone who has the ability to fix a problem from either ignoring the correspondence or thumbing their nose. And I think the comportment of Mr. Fine, who was my flight instructor back in 1985, is an octogenarian himself. He is the executor of the estate. He's got some hip problems and some other problems, but his mind is sharp. And Mr. McDowell allowed Mr. Fine, who's deep into his 80s, to be the executor, and his daughter. That's the whole staff. His daughter is the secretary for the estate. They're still ongoing. They have a lot of businesses. One of the things she does is write my checks every month, for which I'm grateful. What did they do? They timely said, this is important. Where is it? Send us pictures. Send us a location. We want to respond to this. They didn't thumb their nose, throw it in the trash, or ignore it. Mr. Brennan, for reasons that he believes are appropriate, that are in the record, didn't respond. So what did my client do? He did what the Gospel of Matthew says that Jesus tells us to do. If a man asks you to go with him a mile, that's a bad example in this case, go with him too. He writes a second letter. Dear Mr. Brennan, I sent you a letter. This seems important stuff. We need to pay attention to this. Where is it? Help us find it. Mr. Brennan didn't respond. And as you judges so adeptly and keenly touched upon, if Mr. Brennan didn't want to make himself a witness, he didn't want to communicate directly with parties, and I give him kudos for that. He is a smart man. I don't think he did well in this case because I think he and his client conspired to withhold information. They didn't just not provide it. They secreted it. They wanted to let the 60 days run. Once the 60 days ran, they knew that they were in a different realm. I think we waited a long time then after the 60 days. Don't interrupt me, please. With all due respect. Don't interrupt me, please. I'm sorry. I apologize. I thought you asked me a question. I apologize. I'm sorry. Proceed. I apologize. I thought you were asking a question. Yes, they did wait some time before they filed, but Mr. Brennan, like myself, is a solo practitioner, so I'm sensitive to that type of operation. And as is in his custom with this case, he has sought extensions, just like I do when I practice, because he's got a lot of stuff to do and he's a solo. I don't know why they waited. I don't know if it's because he was busy. It's really not that important. But I will tell you that once the 60 days… But certainly the time that they waited does not support your argument that they conspired to keep the information away from you so that they could file a snap complaint. No, not to file a snap complaint, Your Honor, but to let the 60 days go by. Well, you were saying that they let the 60 days run so that they maybe could have jumped on a complaint and then been in a better position to get fees. But that doesn't appear to be the case here. They waited over a year. I understand your point. I don't know that the facts support your conspiracy argument. I understand what you're saying. I just think that they did what they could to maybe check a box on notice but didn't do all that they could have done. That's Judge Hardiman's point about geospatial location. They don't have to do all they can do. That's not what the regulation requires. The regulation requires that they include sufficient information to permit the recipient to identify, et cetera, et cetera. Well, that's a good point. I agree with you 100%. They don't have to do everything, bold, italics, underlined, that they can do. But they have to do everything they can do to trip that trigger of sufficient. And if they had within the ambit of their knowledge, which they certainly did, sufficient information for them to find it, they also had sufficient information for us to find it. So you didn't do anything on the geolocation, right? Is that something that needs to be part of the record? I mean, it's not in the record now. I think that if Mr. McNamara had a smartphone and having some familiarity with this, even if location services are turned off, there is metadata within the device. And it's there for a reason. Federal law enforcement and the intelligence community uses it. And just for your own edification, if you shut your location services off, Big Brother can still find you because that metadata is still in the phone. But even if he only had a flip phone, even if he only had a compass or a sundial, a bearing in distance from the pump house would have been invaluable. Just generally head north-northeast for about 200 paces and you'll find it. That's basic land navigation that's been going on since, you know, the beginning of time. Boy Scouts learn it. Or conversely, coming from the other way, go to the Garden State Parkway. Milepost 102.1, just before that milepost. So did you ever ask the hiker or the president whether the hiker had accessed the site from either of those poles? Or was that an unknown? To be candid, my client was so upset about being dragged into this lawsuit that he asked me to try to find the identity of the hiker, preferably within the one-year statute of limitations to charge that person he or she with trespassing. And perhaps for that reason, perhaps for reasons that I don't understand, the identity of the hiker has also been secreted. We just know that person as the hiker. Certainly the plaintiff knows who the hiker is. So... Well, they were protecting the whistleblower. Well, they could have waited a year and a day and let the statute run and then, you know, then the statute is run on disorderly persons. You made the argument in your brief that since the site was remediated, you know, this case should be over. Well, you know, that's how we felt all along. If the purpose of the act is to protect the water, the Clean Water Act, and if the purpose of the plaintiff entity is, as their president acknowledged during my deposition of him, consistent with their mission statement, which is to protect the waterways of Shark River, to protect the water of the Shark River, then once it was located, and Ms. Simone either didn't have a chance or was too much of a lady to get into it, but once the lawsuit was filed, I've got to tell you, the plaintiff made it very difficult to fix it. They actually argued against... They made a big thing about why did you apply for an emergency permit? Because we want to fix it right away. They wanted to be involved in the planning of how it was fixed. No, Walt Township has plenty of engineers and they're licensed professionals. They'll figure it out. Well, we want to have a say-so on how it's fixed. And then they wanted to be there during the construction. I mean, they were obstructionists, but eventually it got fixed. So if the goal of the Clean Water Act is to fix the waterways, and if the goal of the Shark River Cleanup Commission is to fix it, then once it got fixed, that should have been the end of it. But there was a big six-figure number to settle the case entirely, and that was just, you know, didn't fly. So we believe that the purpose of the act has been satisfied. The mission statement of the Shark River Cleanup Coalition has been accomplished, and everybody should go home and we shouldn't have to be here. But it's about money, and that's what I've argued all along, that this was a money grab for the Shark River Cleanup Coalition. And by just barely checking a box on notice, but yet secreting the location, secreting the identity of don't make it easy for us to do what the Clean Water Act wants us to do, then we can get more money. Now, I understand that there was a gap between the 60 days and the filing, but notwithstanding that, what is left other than money? They want money, and that's the thing that I believe that they tried to frustrate the defendant's ability to find it. Think about it. They had a monopoly on the knowledge of the location. This pipe, as you can see in the picture, it's horizontal, it tangents vertically, and then it goes back to horizontal. That's not a normal thing for a pipe to do. So from a topographical standpoint, somebody could have looked at a topomat and said, hey, you know, look how that pipe goes. It goes in a sharp angle down. We have to look for a steep topographic reveal. We could figure this out. I mean, you know, a cartographer could do that. An engineer could do that. So that's your argument for why the photo would have been helpful. Absolutely, because it's very unique for a pipe to go horizontal and then dip down what looks to be about a 45-degree angle and then, you know, resort back to horizontal again. That means that the terrain for which it was installed under would have had a similar contour, and somebody would have brained, like a civil engineer, I'm just a country lawyer, but they could have figured that out. They could have said, all right, there's only three places on this whole site that are like that, and let's focus on those three places. All right. Mr. Novak, I think we understand your position. Do you want to wrap up? I don't want to grab a defeat from the jaws of victory. Thank you for your time. All right. Thank you, Mr. Novak. We'll hear Mr. Brennan's rebuttal. Could you start with that point Mr. Novak finished off on? Would it not have been helpful? Well, obviously, if the pipe has a tremendous number of variations in height, it wouldn't be helpful, but I don't know whether it did or didn't. Isn't it possible that showing them the photo with the variation in height might have given them an opportunity to discern where it was? They would have had to walk the easement. Ultimately, it's Patrick got us a topographic map, and he plotted this. And in his report, he said there are similar situations which support McNamara's view of seeing other spots that are along the way. But in the end, they would have had to walk the easement. This was their easement. They created it. They have an obligation to maintain it. The point about, well, one of your judges asked Ms. Simone, well, what if there was some sort of leak or something like that? How would you find it? The bottom line is without maintenance or anything along those lines, and they don't have access. She said that, oh, we have access for maintenance. They don't have access for anything. Their subterranean easement is all they have. They have no right to access, which is one of the things we asked for, and one of the things Judge Goodman ordered, a maintenance plan and a license for access. Those were two of the things that she ordered be produced, that they did not produce in Violet Brewer. Let's go back to your president going back to the site and finding it. After having it admitted, I think he had a little bit of difficulty once. And then he found it. When he found it, was there a reason why the coalition didn't advise Wall or McDowell the general area where he accessed the site to find it? Was there a reason why? Because, yeah, well, I'm thinking about this issue of the easement being a heavily wooded site. It's a mile long. We contest that it's a heavily wooded site. All right. You say it's not a heavily wooded site. Okay. I take that. But if the photo perhaps isn't that helpful, it certainly would have been helpful, would it not, for the coalition president to say, you know what, I went in a little ways from a pump station or I went in from the roadway, you know, to give some facts as to generally where he accessed the site. Is there a reason that information was never disclosed? Yes. And the reason why was because we presumed that a township with the responsibility of a 12-inch forced sanitary sewer main would have some sort of information about the maintenance and location of their easement. We assumed that they were going to be able to, you know, to be able to find it without any problem. But they told you quickly they couldn't find it and they asked for more information. They asked for, and by the way, the record is that Mr. Fine sent me the one letter. The record is that I went to the coalition and the coalition ultimately decided that they would give those photos to Ambrosio. Okay. That's what happened with the photos. And Ambrosio filed it. And Ambrosio did file it. Well, the photos apparently helped him. No, no, no. No? Photos were irrelevant to Ambrosio. He ultimately found it. Ambrosio doesn't believe that the photos helped him find it. The photos, look, the graphic depiction of what I put in the notice are the verbal equivalent of the photos. So what the photos would have done is the photos would have, I would concede, the photos would have showed them, hey, this is a pretty serious thing. But the notice said this is a pretty serious thing. The notice said that it was a sanitary sewer easement. The notice said that the pipe was flying in the air. So I think that the photo, and by the way, the photos ultimately, they were given to Ambrosio when we went to the initial conference in front of Judge Goodman. Judge Goodman said, Mr. Brennan, they want the photos. Send them the photos. I sent them the photos. They were saying they needed the photos to find the site. The truth of the matter is they had already found the site. That was in March of 2018, the initial conference. Okay? They had found the site based upon Petroff's declaration, which they submitted for summary judgment, right? They had admitted that the site was found in November 2017. So who's playing this? Who had sued after the lawsuit was filed. Right after the lawsuit was filed, after it was served on them. And I want to just correct a couple things. First of all, that reference to six figures is so off base. It's outrageous. That's not what this is, a money grab, calling us a money grab. Take a look at our website. You tell us whether or not we're here for a money grab. The bottom line is they did not go and retrieve that sand and those pollutants to this very day. They can't say, oh, we would have gone and cleaned it up. They haven't cleaned it up. We are here because they have not cleaned it up. In the end, when they were like, well, you know, what else do you want us to do? Go and clean it up. Well, we're not talking anymore. That's what happened. And by the way, you know, I put eight yards of mulch out in my yard every spring, and I can't walk for the next two days. Three hundred and thirty-four cubic yards of dirty fill that was used as the backfill went into the Shark River Brook. That's a Category 1. We worked. We got that Category 1. It provides drinking water for them to say we don't care enough to go and finish the job, retrieve and mitigate. Every single environmental case that deals with a discharge requires retrieval and mitigation. They have not done it. All they did was what they did in the very beginning. Mr. King said, oh, Judge, he said to Judge Goodman, oh, this was after Mr. Novak here said, oh, we need the help to find – they were due to give us the plan, okay, and then we were going to have the inspection. And Novak says, Mr. Novak says, hey, Judge, we need the help of the coalition to be able to find this. This is all on the record. They had already known where it was since November of 2017, so they were not square with the judge. Then Mr. King, two days later, realizing, oh, my God, we just misrepresented the situation to the judge, he sent a second letter and says, hey, Judge, look at these photos that they sent us. This is not a big problem. We should just be able to – Mr. Brennan, for what it's worth, probably nothing. Let me assure you from my point of view, my personal point of view, I don't know Shark River Cleanup Coalition, but I do not believe that organizations like it, organizations of this kind, exist to participate in money grabs, for what it's worth. Thank you. Okay. Now, the other thing is – Your time is up, so please, I'm going to ask you to wrap up as succinctly as you can. Your Honor, there is a continuing violation of the Clean Water Act at that site. They found that site without any problem once they were motivated to find the site. The notice did not motivate them. Perhaps they decided, well, since they didn't send us the photos, therefore we have a safe harbor and we don't need to go into it. Continuing violation because they haven't cleaned up what they – The soils, 334 cubic yards of soils that are tainted with solid waste. And that 334 cubic yards, you're not talking about the fill they put on the flying pipe. No, no, no. That's a fluent that went into the Shark River over some period of time, right? The stormwater was channelized, brought to the site. It exploited – Over how many years? Since probably – since it was initially – you know what? If they had maintained it, we would know that information. So how do you get that – Over how many years? I mean, it's – It was – well, we don't even know when it was installed. Did all of the 330 cubic yards come from the channel that's shown in the photo under the pipe? Correct. Or did it come from various multiple units? No, no, no. It all came from the – what Fitzpatrick did was he measured cross-sections, he measured length, and he did the computation, and he came up with 334 cubic yards of solid waste-infused sand and loam being discharged out of that – That loam. Into the Shark River perfect. That's your expert's calculation. That is. That's their calculation. And there's no rebuttal because their expert – they didn't even bring their expert in until after the remediation had been done. All right. All right. We understand your position. Can I just say – they've made factual errors here with respect to the record. Well, we – believe me, we have the record and we will – we will – Some of the pieces they made are just factually inaccurate. I can assure you that any – while we do sometimes go beyond the red light, it is rare that we go beyond the red light to this extent. And I can assure you that in any case where that happens, there will be a tremendous amount of attention paid to the case in the weeks and months to come. So the court will take the matter under advisement, and we thank counsel, all of your – all of you for your fortitude. Thank you. I think my voice may have dropped and you may not have heard it. That's all right. That's all right. We can adjourn.